Emily NYBERG, Plaintiff,

v.

MONTGOMERY WARD & CO., a corporation admitted to do business in the State of Michigan, Defendant.

No. 453.

United States District Court
W. D. Michigan, N. D.

Feb. 4, 1954.

Motion to Vacate Denied Aug. 12, 1954.

See 123 F.Supp. 599.

Doyle & Doyle and Thurman B. Doyle, Menominee, Mich., for plaintiff.

Barstow & Barstow and George Barstow and Steven G. Barstow, Menominee, Mich., and John A. Barr, Chicago, Ill., for defendant.

STARR, District Judge.

This action was begun by the plaintiff, a resident and citizen of Michigan, in the circuit court of Menominee county, Michigan, against the defendant, an Illinois corporation, to recover damages for her personal injuries which she claims resulted from defendant's negligence in the disconnecting of a hot-water tank from a cook stove in her home. The action was removed to this court on the basis of the diversity of citizenship of the parties, 28 U.S.C. § 1441 et seq., and was tried before the court without a jury.

The plaintiff Emily Nyberg and her husband, Clifford Nyberg, lived in Menominee, Michigan. The cook stove in the kitchen of their home was a combination wood-coal-and-gas-burning stove equipped with a hot-water jacket and with a coil in the fire box, and as the water was heated, it was conveyed into a 30-gallon tank located behind the stove. The defendant owned and operated a general department store in Menominee, which included among its many departments a plumbing and heating department. Richard Vander Sluis was general manager of the defendant's store and Frank Schreiner was manager of the plumbing and heating department. The defendant company employed one William McVane as an independent contractor to install furnaces which it sold.

About November 14, 1950, plaintiff's husband, Clifford Nyberg, through Vander Sluis and Schreiner, entered into a contract with the defendant company for the purchase of a warm air furnace to be installed in his home, at a price of $780. The defendant arranged with McVane to install the furnace, and its contract price of $780 included $620 for the furnace and $160 as McVane's charge for installation. McVane began installing the furnace in plaintiff's home in November,

1950, and the installation was substantially completed by about December 14th. The next day, December 15th, McVane disconnected the pipes leading from the water jacket in the cook stove to the water tank behind the stove, and moved the tank into the basement. When he disconnected the pipes on the water jacket, he closed the ends of the pipes by placing caps over them, and he neglected to leave a vent or opening in the caps or jacket whereby steam pressure developing in the water jacket could escape. He obviously failed to ascertain if there was any water or moisture remaining in the water jacket before he capped and closed the connecting pipes. During the afternoon of the 15th the plaintiff built a fire in the cook stove to prepare the evening meal, and when water or moisture remaining in the water jacket became heated, with no vent or means for steam to escape, a terrific explosion occurred. Fragments of metal were blown about the kitchen with great force, and plaintiff was severely injured, requiring medical care and hospitalization. The parties by their attorneys have filed a written stipulation of facts relative to McVane's disconnecting the water jacket and the resulting explosion. This stipulation states in part:

"That at the time of the injuries complained of, the water jacket in the stove in the Nyberg home was disconnected by one William McVane; that in disconnecting the water jacket, the openings in the jacket were all closed by McVane without venting the jacket to the atmosphere; that some water or moisture remained in the jacket; that when heated, such water or moisture caused said jacket to become subject to dangerously excessive internal pressure; that as a result thereof, the jacket exploded, causing the jacket and stove to explode, and caused iron fragments from the jacket and stove to be violently precipitated from out of the stove."

In her complaint the plaintiff alleges that the explosion and her injuries and resulting damages were caused by the negligence of McVane, acting as defendant's agent and employee, in disconnecting the hot-water tank from the water jacket in the stove and closing and capping the pipes leading from the jacket, without providing a vent or opening for steam to escape. In its answer defendant denies that McVane was acting as its agent or employee, and denies all liability to plaintiff.

McVane's negligence in closing and capping the water jacket without leaving an opening or vent for steam to escape is too obvious to require discussion. The real question in this case is whether McVane, in disconnecting and capping the pipes leading from the water jacket, was acting as the agent or employee of the defendant, or as the agent or employee of plaintiff's husband. The testimony bearing on this point is conflicting and unsatisfactory. The plaintiff contends that when the installation of the furnace was substantially completed, an interview took place in the basement of their home between her husband and Schreiner, manager of the defendant's plumbing and heating department, and contractor McVane, and that in this interview it was arranged as follows: That a water heater would be purchased from defendant company and installed in the basement near the furnace; that the hot-water tank in the kitchen would be disconnected from the water jacket in the cook stove and moved into the basement; and that the tank would then be connected with a coil in the furnace and with the water heater to be purchased. Schreiner denies there was any conversation relative to the purchase and installation of a new water heater. McVane and Schreiner both contend that Nyberg personally arranged for McVane to disconnect the water tank from the water jacket and move the tank into the basement and connect it with a coil in the furnace. In determining whether McVane, in disconnecting the water tank

from the water jacket, was acting as the agent or employee of the defendant company or as the agent or employee of plaintiff's husband, the court must consider the pertinent testimony and the surrounding facts and circumstances. Plaintiff's husband, Clifford Nyberg, testified in part as follows:

"Q. * * * Did Mr. Schreiner come to the house to look over the completion of the (furnace) installation? A. He did. * * *

"Q. Was there anything said between you and Mr. Schreiner regarding the sale of a hot water heater? * * * A. At the time Mr. McVane and Schreiner were both down in the basement, and we started to talk about hot water. Now, of course, I knew that we needed a bullet-type stove— * * * it is a small stove, that you can build a little fire in in the summer months, and it heats the water, so I had that in mind at the time, and I spoke to him (Schreiner) about getting one. * * * We spoke of getting a heater and where it was to be installed, where the hot water tank was to be situated, where the pipes were going to be run, and how much pipe we needed, what type of pipe, and in this case I told him to get the copper pipe. * * *

"Q. Now, just tell us, Mr. Nyberg, what Mr. Schreiner said regarding the installation of this bullet-type hot water heater, and anything that was said about the cost, the price of it. A. Well, the cost was not arrived at; there was no conversation between Schreiner and myself or McVane or Montgomery-Ward's about price; that was not done. The only thing we talked about at the time with Schreiner was the amount of pipe needed, where the bullet stove was to be situated; where the tank was to be situated, and they were just talking about equipment at that time. * * * There was a certain place

it (water heater) was to be installed, near the furnace.

"Q. Did Mr. Schreiner say who would install the heater? A. No, he didn't say.

"Q. What was said about the installation of the heater? A. Well, I took it on myself more or less to presume that McVane would install it, because I had seen plumbing tools in his car. At the time he installed the furnace, he left my work to go and install a bath room; I had no reason to believe that he was not a plumber, or no reason to believe that he wouldn't put it in.

"Q. * * * After that conversation was there any of the material for the heater sent up to your house? A. Yes, at the time it was delivered I was on duty that day, and I received a telephone call from McVane at Ward's store, and he said the pipe was going to cost me $28 and some cents, and at that time I asked him if I should come down to the store, and he said 'No, that is not necessary; we will take care of that ourselves.' So I presumed that he had gone to the office and made arrangements by which the pipe, and so forth, would be delivered, because the pipe was delivered.

"Q. What else was delivered in addition to the pipe? A. That is all, besides the couplings and the joints, a box of those—and, of course, his tools were brought down (to) the basement.

"Q. And those pipes and couplings were all for use in putting in the heater, and they had nothing to do with the furnace or any other appliance? A. No, nothing to do with the furnace.

"Q. * * * Tell us what Mr. McVane did after that. A. Well, the first job was to take the hot water tank from behind the kitchen stove and bring it down (to) the basement. * * *

"He (Schreiner) did have a discussion with me in regards to the installation of the heater, and he was there with McVane and myself; he discussed it right with us, and Schreiner pointed out the position where the hot water heater should have been, also the tank. * * * He (Schreiner) give an estimate on what pipe I would need and also on the type of pipe; he suggested copper piping, which was a little hard to get at the time. * * He laid out the position of the tank and where the pipes were to run, what they were to be connected to, and so forth. * * *

"Q. So it took about a hundred feet of pipe to run from the hot water tank to the north end of the house and connect it with the tank? A. That is right, beside fittings to hook up the tank to the hot water heater.

"Q. Was that hundred feet of copper pipe delivered to your house? A. I was not there at the time, but I know it was delivered at the house. * * * It is still wrapped up the way it was when it was delivered. * * * I do know there was no question of price mentioned or money, or wages; the object of it being on my part to get it in. * *

"Q. Now, was there any discussion between you and Mr. Schreiner as to what kind of a hot water heater you were purchasing? * * * A. Yes, we discussed a dome shaped hot water heater, that is used in the summer time to heat water."

Schreiner, the manager of defendant's plumbing and heating department, testified in part:

"Q. Did you have any conversation with Mr. Nyberg in reference to anything, that is outside of the furnace, about some pipes or a hot water heater? A. I had no discussion whatsoever with him. * *

"Q. Who was supervisor over Mr. McVane? A. I usually super-vised the work and the manner in which he was putting it in. * *

"Q. Mr. Nyberg testified that there were some discussions between you and he in reference to installing a hot water heater? * * * A. There was no discussion regarding —no discussion with I and Mr. Nyberg regarding installation of his hot water tank at all. * * *

"Q. Were you present when there was any discussion between Nyberg and Mr. McVane with reference to a hot water heater or installing a hot water heater? A. Yes. * * * Mr. McVane told Mr. Nyberg he did not want to do the work, because he was not a licensed plumber. Mr. Nyberg said: 'Would it be all right if I helped you?' Mr. McVane said: 'Yes, I believe it would.'

"Q. Will you tell us to what extent, if any, you may have entered into that discussion? A. None, to my knowledge. * * *

"Q. Do you recall having been in the basement of the house with Mr. Nyberg and Mr. McVane? A. Yes, I was.

"Q. And do you recall that you pointed out the exact position in the basement where the heater was to be installed? A. No, I don't believe I pointed out any actual location. * * * I don't remember saying anything to him in regard to the installation of it.

"Q. Didn't you tell Mr. Nyberg, speaking with reference to the piping that was to be used, that you would run the piping from the hot water tank to the extremities of the house where it would be connected with the hot water going upstairs? A. No, sir. * * *

"Q. Didn't you have some discussion with Mr. Nyberg when you were in the house a short time before the furnace was completed, that you could sell him a dome or bullet-shaped heater, hot water heater? A.

No, sir. * * * I did not have any discussion about any hot water heater with Mr. Nyberg, and I don't know of anybody going to sell him one. * * * I did not hear any discussion whatever regarding a hot water heater; I absolutely cannot recall any such discussion regarding a hot water heater; they did discuss the installation of a coil in the furnace, and I heard Mr. McVane and Nyberg going over it. * * * Mr. McVane purchased for Mr. Nyberg some copper pipe fittings to connect the coil to his tank, that is the coil in the furnace to his tank; as far as any connections to a hot water heater, I know of none. * * *

"Q. Did Montgomery Ward Company deliver any items to Nyberg's residence to be used for installing a heater? A. No."

McVane, the contractor whom defendant had employed to install the furnace in the Nyberg home, testified in part:

"Q. What discussion did you have, if any, with Mr. Nyberg with respect to removing the hot water tank at his home? A. Just that we talked it over, and we was going to put it in the basement and hook it up to the furnace; outside of that there was no discussion.

"Q. For whom were you working at that time? * * * When you removed the hot water tank? A. I was working for Mr. Nyberg.

"Q. Who purchased the connections for the hot water tank? A. I did. * * * I delivered them.

"Q. Who paid for them? A. I did.

"Q. What was the conversation between yourself and Mr. Nyberg with reference to your doing the work? A. That I was going to help put it in, because I didn't have any authority. * * *

"Q. Can you tell the court as best as you can remember, what the words said by yourself or Mr. Nyberg were? A. Just that I was going to

move the tank downstairs and connect it to the furnace, or to a heater; that is about all there is to it. * * There was no pay mentioned—I can't remember of any money being involved in it; just the money that was involved was the material that I would buy. * * *

"Q. You were going to remove the tank and put it near the furnace, for the purpose of later connecting it up with a hot water heater, were you not? A. Yes, sir.

"Q. * * * And you were to connect the tank with a hot water heater that Mr. Nyberg was buying from Montgomery Ward? A. No. * * * Because there was no hot water heater there, the only thing that was there was a hot water coil that fitted into the furnace.

"Q. * * * And this tank was not to be connected with the hot water coil in the furnace, but it was to be connected with a hot water heater that Mr. Nyberg was buying? A. It was to be connected to the coil which fitted into or inside the furnace. * * * There was no heater. * * *

"Q. Now you had some material (copper piping) delivered up to the Nyberg residence, didn't you? A. Yes, sir. * * *

"Q. And that copper piping was not being used or to be used in connection with the furnace, but to lead the hot water from the tank to different parts of the house, was it not? A. That is right. * * * There was piping there from the coil to the hot water tank. * * * I was going to put this hot water tank in for Mr. Nyberg; when I got through with the furnace, I was automatically done with Ward's. * * *

"Q. You were still working for Ward's when the material for the heater was delivered to the Nyberg's house? A. No, sir; I went down to the store, and Mr. Nyberg was

supposed to meet me there to pick up the material. But he was not there, so I called where he was working and he asked me if it would be necessary for him to come there, and I told him 'No,' so I went and bought the materials and delivered them to his house.

"Q. You were still working on the furnace job? * * * A. There might have been a few things that was not done, like taping.

"Q. Didn't you come back to the Nyberg house after the explosion? A. Yes. * * * To finish helping Mr. Nyberg put in this hot water tank. * * * After the explosion, a few days later I went there; there was something had to be straightened out. * * * On the furnace."

From examination of the foregoing testimony it is clear that there was no definite arrangement or agreement between plaintiff's husband, Clifford Nyberg, and Schreiner of the defendant company for disconnecting the water tank from the water jacket in the stove and moving the tank into the basement, and no definite arrangement or agreement for the purchase and installation of a new water heater in the basement of the home. Nyberg's testimony regarding his conversation with Schreiner and McVane in the basement of the home is particularly significant. He testified that he said they needed a bullet-type stove in the basement to heat water in the summer; that they spoke of getting a new water heater, where it was to be installed in the basement, and the type of heater and amount of pipe needed. He testified there was no conversation as to price or terms for the purchase of a heater. He testified there was no talk about defendant company's installing the heater, and he said, "I took it on myself * * * to presume that McVane would install it, because I had seen plumbing tools in his car; * * * I had no reason to believe * * * that he wouldn't put it in." It appears that subsequent to the above-mentioned conversation in the basement and prior to the explosion, McVane went to the defendant's store and purchased certain pipe, joints, and couplings, which he delivered to the Nyberg home. He testified that these were to be used for connecting the hot-water tank to the coil in the furnace, and for conveying water from the tank through the house. It is significant that this pipe and other materials were apparently paid for by McVane or charged to him, as he expressly testified that he "bought the materials" and that he paid for the connections. If, as Nyberg claims, it was understood and agreed that the defendant company was to sell and install a new water heater in the basement and disconnect the water tank from the stove and move it into the basement, it hardly seems logical that McVane would have bought and paid for the pipe and other materials. The most that can be said for Nyberg's testimony is that it indicates he talked with defendant's employee Schreiner about buying a new water heater, about the type of heater needed, where it was to be installed, and what pipe would be needed. The testimony indicates that before Nyberg actually purchased a new water heater, the water tank in the kitchen was to be disconnected from the stove and moved into the basement, and it seems clear that the work of disconnecting the tank from the stove and moving it into the basement was done by McVane for the plaintiff's husband and not for the defendant company.

■■ This explosion was a most unfortunate occurrence and caused the plaintiff serious injuries and resulting damages. However, the burden was on the plaintiff to prove her case and all the necessary elements thereof by a fair preponderance of the evidence, and the court is convinced that she failed to sustain this burden of proof. After consideration of all the evidence and the surrounding facts and circumstances, the court is constrained to conclude: (1) That in disconnecting the water tank from the water jacket in the stove and negligent-

**122**

ly failing to leave a vent or opening for steam to escape, McVane was not acting as the agent or employee of the defendant company, and (2) that in disconnecting the water tank from the water jacket, McVane was acting as the agent or employee of plaintiff's husband. Therefore, the defendant company cannot be held liable for plaintiff's damages resulting from her personal injuries sustained in the explosion. In view of the court's conclusion the question as to the authority of Schreiner, the manager of defendant's plumbing and heating department, and other questions presented do not require consideration.

Judgment for the defendant of no cause of action will be entered, and it may recover court costs.

### Findings of Fact

1. In disconnecting the water tank from the water jacket in the stove in plaintiff's kitchen, William McVane was not acting as the agent or employee of the defendant Montgomery Ward & Company.

2. In disconnecting the water tank from the water jacket in the stove, McVane was acting as the agent or employee of the plaintiff's husband, Clifford Nyberg.

3. Plaintiff's personal injuries and resulting damages were not caused by the negligence of an agent or employee of defendant company.

4. Plaintiff is not entitled to recover from the defendant company the damages resulting from her personal injuries.

### Conclusions of Law

1. This court has jurisdiction of the parties and of the subject matter of this suit.

2. The plaintiff is not entitled to recover from the defendant company the damages resulting from her personal injuries.

3. The defendant company is entitled to a judgment in its favor of no cause of action.